IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-727

Filed 1 April 2026

Moore County, Nos. 24JA000010-620 & 25CV000866-620

IN THE MATTER OF:

A.C.

Appeal by respondent-mother from orders entered 6 May 2025 and 8 May 2025 by Judge Yohan Namkung in Moore County District Court. Heard in the Court of Appeals 10 March 2026.

*Sharlene Gilmer Anderson, for petitioner-appellee Moore County Department of Social Services.*

*Anné C. Wright, for respondent-appellant mother.*

*Ellis & Winters LLP, by Christopher E. Rhodes, Jr., for appellee guardian ad litem.*

FLOOD, Judge.

Mother appeals from the juvenile court's permanency planning hearing order and custody order awarding custody of Sara[1] to Sara's paternal uncle. Mother argues that the district court's custody and visitation determinations are unsupported by the findings and evidence and contrary to the child's best interest. For the following reasons, we vacate both orders and remand to the juvenile court for further proceedings consistent with this opinion.

---

[1] We use pseudonyms to protect the identity of the minor child. *See* N.C. R. App. P. 42 (2025).

- 1 -

## I. **Factual and Procedural Background**

This case was initiated on 15 February 2023 when Petitioner Moore County Department of Social Services ("MCDSS") filed a Juvenile Petition in Moore County District Court alleging Sara was a neglected juvenile. The basis for Sara's neglect, as alleged in the petition, was an incident that occurred on 2 December 2023 wherein the eldest child of Mother and Father—Sara's older brother—was discovered dead in Sara's bedroom after having been left unattended in intense heat for over twelve hours. The doctor investigating the child's death believed the cause of death was hyperthermia and dehydration. When MCDSS became involved, the parents agreed to permit MCDSS to take Sara in for a temporary safety placement.

Sara was adjudicated neglected on 6 September 2024. In the adjudication order, primary custody of Sara was awarded to Sara's paternal grandparents, with weekly visitation for Mother and Father. The juvenile court's 7 January 2025 disposition hearing order reiterated that Sara was neglected, announced a primary plan of reunification for Sara, and assigned Mother a case plan. At some unspecified point in time, Mother and Father became estranged. Father was charged with felony involuntary manslaughter for his role in the events of 2 December 2023.

On 6 May 2025, the juvenile court entered a permanency planning hearing order. The order, in relevant part, reiterated that Sara was neglected; granted sole physical custody of Sara to Sara's paternal uncle, a deviation from her existing placement with her paternal grandparents; granted Mother a minimum of two hours

of visitation each week; and purportedly terminated its own jurisdiction pursuant to N.C.G.S. § 7B-911. The juvenile court also concluded as a matter of law that Mother had "waived [her] paramount constitutional rights to care, custody, and control of [her] child"; specifically, that she

> acted inconsistently with her constitutionally protected status due to her cumulative conduct by refusing to work with the [guardian ad litem] and MCDSS, b[y] refusing to engage in all aspects of her case plan, and by essentially ceding her parental rights to a third party by not engaging in or even attempting to engage in the care, support and upbringing of the child outside of nominal visitation.

Two days later, after the purported termination of the juvenile court's jurisdiction, the district court entered a custody order that, in relevant part, reiterated physical custody was to be with Sara's paternal uncle; granted Mother a minimum of two hours of weekly visitation; and left all medical, mental health, and educational decision-making with Mother, Father, and Sara's paternal uncle jointly. In entering the order, the district court again concluded that Mother had "acted in ways inconsistent with [her] constitutionally protected status as a parent."

Mother timely appealed.

## II. **Jurisdiction**

This Court has jurisdiction over Mother's appeal pursuant to N.C.G.S. § 7B-1001(a) (2023).

## III. **Analysis**

On appeal, Mother argues the juvenile court's permanency planning hearing

order and district court's custody order were erroneous in several respects. Specifically, Mother argues the trial court (A) erred in awarding custody of Sara to her paternal uncle when placement with that uncle was never a permanent plan for Sara prior to the award of custody; (B) erred in determining she waived her constitutional rights as a parent; (C) abused its discretion in determining that ceasing reunification attempts between Mother and Sara would be in Sara's best interest; (D) erred in that, when awarding custody to Sara's paternal uncle, it failed to verify his understanding of the placement's legal significance as required by N.C.G.S. § 7B-906.1; (E) abused its discretion in deviating from Sara's stable placement with her grandparents; (F) failed to comply with N.C.G.S. § 7B-905.1 in defining the scope of visitation; and (G) made insufficient findings of fact and conclusions of law in the custody order. For the reasons discussed below, we vacate and remand both orders.

## A. Custody Order

Mother first argues the trial court erred in awarding custody of Sara to her paternal uncle when placement with that uncle was never a permanent plan for Sara prior to the custody order. In particular, Mother argues the trial court violated N.C.G.S. § 7B-911(c)(2) when it terminated the juvenile court's jurisdiction and initiated Chapter 50 proceedings prior to complying with statutorily mandated timeframes. In so arguing, Mother challenges both the legal conclusions in the permanency planning hearing order and the jurisdictional sufficiency of the custody order. We agree.

"We review issues of statutory construction *de novo.*" *In re Ivey*, 257 N.C. App. 622, 627 (2018). Similarly, "[w]hether a trial court possesses subject-matter jurisdiction is a question of law that is reviewed de novo." *In re M.A.C.*, 291 N.C. App. 35, 38 (2023) (citation and internal quotation marks). On de novo review, "this Court considers the matter anew and freely substitutes its own judgment for that of the trial court." *In re T.N.G.*, 244 N.C. App. 398, 402 (2015) (citation modified).

Under N.C.G.S. § 7B-911, a juvenile court may, under appropriate circumstances, terminate its jurisdiction over an abuse, neglect, or dependency case so that a district court may subsequently enter a civil custody order. *See generally* N.C.G.S. § 7B-911 (2023). Among these circumstances is that the trial court satisfy the following requirements:

> (1) Make findings and conclusions that support the entry of a custody order in an action under Chapter 50 of the General Statutes or, if the juvenile is already the subject of a custody order entered pursuant to Chapter 50, makes findings and conclusions that support modification of that order pursuant to [N.C.G.S. §] 50-13.7.

> (2) Make the following findings:

> a. There is not a need for continued State intervention on behalf of the juvenile through a juvenile court proceeding.

> b. At least six months have passed since the court made a determination that the juvenile's placement with the person to whom the court is awarding custody is the permanent plan for the juvenile, though this finding is not required if the court is awarding custody to a parent or to a person with whom the child was living when the

juvenile petition was filed.

N.C.G.S. § 7B-911(c) (2023).

"In certain cases which have originated as abuse, neglect, or dependency proceedings under Chapter 7B of the General Statutes," as here, "a time may come when involvement by the Department of Social Services is no longer needed and the case becomes a custody dispute between private parties which is properly handled pursuant to the provisions of Chapter 50." *Sherrick v. Sherrick*, 209 N.C. App. 166, 169 (2011). In these cases, "[N.C.G.S.] § 7B-911 specifically provides the procedure for transferring a Chapter 7B juvenile proceeding to a Chapter 50 civil action." *Id.* "[N.C.G.S]. § 7B-911 sets forth a detailed procedure for transfer of such cases . . . . For this reason, [N.C.G.S.] § 7B-911(b) requires that the juvenile court[2] enter a permanent order prior to termination of its jurisdiction." *Id.*; *see also* N.C.G.S. § 7B-911(a) (2023). But when a juvenile court terminates its jurisdiction prior to the passage of "six months . . . since [it] made a determination that the juvenile's placement with the person to whom the court is awarding custody[,]" N.C.G.S. § 7B-911(c)(2) (2023), the legal determination that the custody of the juvenile court is terminable under N.C.G.S. § 7B-911 is erroneous, and any consequent civil custody

---

2 We note that, in this case, the *district court's* custody order stated "[t]hat this [o]rder upon filing terminates the jurisdiction of the juvenile court." Because it is for the juvenile court, not the district court entering the Chapter 50 custody order, to terminate the juvenile court's jurisdiction, *see id.*, we must view the purported termination of the juvenile court's jurisdiction as stemming solely from the permanency planning hearing order.

order is unsupported by jurisdiction, *Sherrick*, 209 N.C. App. at 171–72.

Here, the juvenile court's permanency planning hearing order purported to terminate its jurisdiction pursuant to N.C.G.S. § 7B-911; however, the Record establishes that six months had not passed since Sara was placed in the custody of her uncle. Thus, the legal conclusion and resulting disposition in the permanency planning hearing order purporting to terminate jurisdiction pursuant to N.C.G.S. § 7B-911 was erroneous. Consequently, the custody order was entered without jurisdiction and has no legal effect. We must therefore vacate the custody order for want of jurisdiction and reverse the permanency planning hearing order's legal conclusion as to the termination of the juvenile court's jurisdiction.

On remand, jurisdiction will remain with the juvenile court until such time as jurisdiction is properly terminated pursuant to N.C.G.S. § 7B-911. *Id.* at 172.

## B. Waiver of Constitutional Rights

Having vacated the custody order and partially reversed the permanency planning order, we must still address Mother's remaining arguments to the extent they are applicable to the permanency planning order. Therefore, we next address Mother's argument that the juvenile court's determinations as to the relinquishment of her constitutional parental rights were erroneous. We review a conclusion that the natural parent's conduct was inconsistent with her constitutionally protected right de novo, and, if challenged, determine whether the findings of fact supporting that conclusion are supported by clear and convincing evidence. *Boseman v. Jarrell*, 364

N.C. 537, 549 (2010) (citation omitted).

"[A] natural parent may lose [her] constitutionally protected right to the control of [her] children in one of two ways: (1) by a finding of unfitness of the natural parent, or (2) where the natural parent's conduct is inconsistent with . . . her constitutionally protected status." *In re D.M.*, 211 N.C. App. 382, 385 (2011) (citation omitted). For purposes of the second prong, "unfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy, but other types of conduct, which must be viewed on a case-by-case basis, can rise to this level so as to be inconsistent with the protected status of natural parents." *In re B.R.W.*, 381 N.C. 61, 82 (2022) (citation modified). "For that reason, there is no bright line rule beyond which a parent's conduct meets this standard; instead, we examine each case individually in light of all of the relevant facts and circumstances and the applicable legal precedent." *Id.* (citation and internal quotation marks omitted). Here, in challenging the determination that she waived her parental rights, Mother specifically challenges findings of fact 21, 26, 28, 29, 31, and 52, as well as conclusions of law 3, 5, and 12. We address each in turn, reviewing the findings of fact for clear and convincing evidence and the conclusions of law de novo. *See Boseman*, 364 N.C. at 549.

Finding of Fact 21 reads as follows: "[Mother] has refused to discuss therapy or provide any information concerning therapy to her social worker." The Record reflects ample, uncontested testimony that Mother declined therapy, and we

understand this finding to communicate that Mother has declined to attend, or communicate with MCDSS about, therapy. To the extent this finding could be understood as communicating that Mother has been unwilling to discuss the *prospect of* therapy with MCDSS, no clear and convincing evidence would support such a finding.

Finding of Fact 26 states

> [t]hat in addition to the lack of progress [Mother] made on her case plan MCDSS continues to have concerns about [] [M]other's activities around the day of the death of the juvenile's older sibling since both parents resided in the same home at the time of his death. [] [M]other was at work during a period of time when the deceased juvenile was alone in his room, but it is unknown whether the juvenile was alive or died before, during or after her leaving and returning from work. [Mother] stated that she did not check on the older deceased child before she left for work or when she came home.

Mother contests this finding on the basis that "[t]he trial court's finding of fact rests on a supposition that the trial court could reasonably infer that [the elder child's] death happened sometime in the approximately two hours between when [he] was laid down for a nap by Father and when [Mother] left for work." In other words, Mother contests this finding on the basis that there is no evidence the deceased child died while she was at home. This argument, if true, would support, not rebut, Finding of Fact 26, as the challenged portion of the finding relates to the juvenile court's inability to confirm precisely when Mother's older child died. This finding is otherwise supported.

In Finding of Fact 28, the juvenile court found "[t]hat [Mother] has visited with [Sara] 3 times since December 2024. She visited with her on Christmas, [Sara]'s birthday and attended one doctor's appointment. [Mother] did spend time with [Sara] during the week her parents were in town visiting from California. [Mother] does not facetime or call her daughter." Mother challenges this finding on the basis that "some other visitation [] took place when the maternal grandparents visited North Carol[ina] for a week." The finding explicitly accounts for this period of the maternal grandparents' visit. This finding is otherwise supported by clear and convincing evidence.

Finding of Fact 29 states

> [t]hat [Mother] did not regularly respond to MCDSS and [the social worker for her case] when she was contacted. When she did respond, she would not commit to speaking with or meeting with [the social worker] or discussing progress on her case plan. Until 4 days prior to the court date, [Mother] would not disclose her address.

Mother contests this finding on the basis that there were "at least 30 conversations via text, telephone, or in person between [MC]DSS and [Mother] from 24 January 2024 through 25 March 2025." This argument is not mutually exclusive with Mother having not regularly responded to MCDSS; and, in fact, the Record reflects a significant frequency of Mother not responding to MCDSS when soliciting a response from her. This finding is supported by clear and convincing evidence.

Finding of Fact 31 states

> [t]hat after [Father] was charged criminally, [Mother] did engage a degree more with MCDSS but not [] engag[e] in increased visitation, in allowing a home visit or in attending individual therapy. [Mother] did respond slightly more often to text messages from [her social worker]. [Mother] spoke with [her social worker] on the phone twice and responded only 5 times to over 20 text messages sent by [the social worker] since November 2024.

Mother contests this finding on the basis that MCDSS's contact log with Mother reveals more than five contacts via text. It is impossible to verify, however, which of the contacts for which a medium was not specified were via text. Mother also argues the testimony from her social worker at trial that she had responded to fewer than five text contacts was insufficient to support this finding. Examination of the social worker's testimony reveals that the social worker alleges she had received "less than five" text responses from Mother. Out of an abundance of caution, however, we will treat this evidence as insufficient to meet the "clear and convincing" standard and disregard Finding of Fact 31 as to the specific number of unreturned texts. *In re A.C.*, 280 N.C. App. at 305.

In Finding of Fact 52, the juvenile court found that "the [guardian ad litem] has not been able to speak very much with [] [M]other, she was only able to speak with [Mother] at the last hearing. [Mother] does not make herself available to the [guardian ad litem]." Mother contests this finding on the basis that the Record reflects there was an instance of phone contact between her and the guardian ad litem in March 2025. To the extent that the finding represents Mother and the guardian ad

litem had never spoken previously, that specific portion of the finding is unsupported.

Finally, in Conclusions of Law 3, 5, and 12, respectively, the juvenile court ruled that "[r]eturning [Sara] to the home is contrary to [her] best interests at this time"; "[t]hat by clear and convincing evidence both [Mother] and [Father] have waived their paramount constitutional rights to care, custody, and control of their child"; and that "return of placement of [Sara] to the respondent parents at this time is contrary to [her] health and safety and best interest . . . and reasonable efforts have been made to prevent the need for placement outside of the home." Under the decidedly unique circumstances of this case, *see In re B.R.W.*, 381 N.C. at 82, we agree with these conclusions of law. Even setting aside Finding of Fact 31, the supported findings in the juvenile court's permanency planning hearing order illustrate that Mother had a yet-unknown role in the death of her eldest child, dealt with mental health issues in the wake of her son's death, and had not been significantly active in Sara's life in the recent past. In light of these findings, the juvenile court's conclusions of law that Mother waived her parental rights are appropriate, as are the consequent determinations about the permanent placement of Sara.

## C. Cessation of Reunification

Mother next argues the juvenile court abused its discretion in determining that ceasing reunification with Mother was in Sara's best interest. "The trial court's dispositional choices—including the decision to eliminate reunification from the permanent plan—are reviewed for abuse of discretion." *In re A.P.W.*, 378 N.C. 405,

410 (2021) (citation omitted). "An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." *Id.* (citation omitted).

Here—as discussed above under the far less deferential de novo standard of review—Mother's unknown role in the death of her eldest child, ongoing mental health issues, and lack of recent involvement in Sara's life, especially in light of Sara's need for permanency, adequately justified the cessation of reunification efforts.

## D. Custodian Verification

Mother next argues the juvenile court erred in awarding custody to Sara's paternal uncle without properly verifying that he understood the legal significance of the placement. Under N.C.G.S. § 7B-906.1(j),

> [i]f the court determines that the juvenile shall be placed in the custody of an individual other than a parent or appoints an individual guardian of the person pursuant to [N.C.G.S. §] 7B-600, the court shall verify that the person receiving custody or being appointed as guardian of the juvenile understands the legal significance of the placement or appointment and will have adequate resources to care appropriately for the juvenile. The fact that the prospective custodian or guardian has provided a stable placement for the juvenile for at least six consecutive months is evidence that the person has adequate resources.

N.C.G.S. § 7B-906.1(j) (2023).

Here, while it is not meaningfully disputed that Sara had been placed with her uncle for less than six months, Mother appears to base her argument on the idea that N.C.G.S. § 7B-906.1(j) requires written findings or a formal colloquy to sufficiently

verify the appropriateness of a placement with a nonparent. Mother does not point us to any authority for this apparent proposition, however, and our Supreme Court has specifically held that "N.C.[G.S.] § 7B-906.1(j) does not require the trial court to make any specific findings in order to make the verification." *In re K.P.*, 383 N.C. 292, 306 (2022) (citation omitted). Instead, "the [R]ecord must show the trial court received and considered reliable evidence that the guardian or custodian had adequate resources and understood the legal significance of custody or guardianship." *Id.*

The evidence before the juvenile court in this case consisted of a twenty-page report by MCDSS relating to Sara's uncle's willingness and ability to care for Sara, the ensuing obligations and responsibilities, and household finances. Thus, the juvenile court did not fail to meet the requirements of N.C.G.S. § 7B-906.1(j).

### E. Abuse of Discretion

Mother further argues that the juvenile court abused its discretion in placing Sara with her uncle instead of her paternal grandparents, with whom she had been living since late 2024. Mother bases this argument primarily on the strength of Sara's bond with her paternal grandparents and the difficulty keeping Sara in frequent contact with Mother given the driving distance between her and Sara's paternal uncle.

The juvenile court's permanency planning hearing order, however, was clear as to why Sara was being moved to a new custodian: despite Sara's strong bond with

her grandparents, the juvenile court explicitly found her grandparents were "advanced in age and their health is declining." The trial court also made findings indicating that Sara's paternal uncle was bonded with Sara. In light of these findings, the trial court did not abuse its discretion in shifting custody to Sara's uncle.

## F. Improper Delegation

Mother next argues that the juvenile court's permanency planning hearing order improperly delegated visitation rights to an opposing party in violation of our precedent. For this proposition, Mother cites *In re Stancil*, 10 N.C. App. 545 (1971), and *Brewington v. Serrato*, 77 N.C. App. 726 (1985).

In *Stancil*, we overturned a visitation order on the basis that it impermissibly delegated a parent's visitation rights to the whims of the child's custodian. 10 N.C. App. at 551–52. While we noted that the delegation was only permissible because the trial court contemplated the mother being fit to have *any* visitation with the child, we nonetheless reasoned that a parent who retains *some* visitation rights with the child cannot retain those rights only pursuant to the whims of an adversarial custodian. *Id*. at 552. Accordingly, we partially vacated the trial court's order and remanded with directions for a clearer visitation schedule. *Id*. at 553. Elaborating on the holding, we clarified that the visitation of a child by a parent is a natural right that must be safeguarded by judicial oversight:

> [A] parent's right of visitation with his or her child is a
> natural and legal right and that when awarding custody of
> a child to another, the court should not deny a parent's

right of visitation at appropriate times unless the parent has by conduct forfeited the right or unless the exercise of the right would be detrimental to the best interest and welfare of the child. The court should not assign the granting of this privilege of visitation to the discretion of the party awarded custody of the child.

When the custody of a child is awarded by the court, it is the exercise of a judicial function. In like manner, when visitation rights are awarded, it is the exercise of a judicial function. We do not think that the exercise of this judicial function may be properly delegated by the court to the custodian of the child. Usually those who are involved in a controversy over the custody of a child have been unable to come to a satisfactory mutual agreement concerning custody and visitation rights. To give the custodian of the child authority to decide when, where and under what circumstances a parent may visit his or her child could result in a complete denial of the right and in any event would be delegating a judicial function to the custodian.

*Id.* at 551–52 (internal citation omitted).

Similarly, in *Brewington*, we reviewed a custody arrangement in which "[t]he court granted [the] defendant visitation privileges in North Carolina at the plaintiff's home with others present 'at such times as the parties may agree.'" *Brewington*, 77 N.C. App. at 732. Citing *Stancil*, we held that this custody arrangement was inappropriate, as it totally delegated the visitation rights of the defendant to the plaintiff:

[W]e cannot approve the provision permitting visitation "at such times as the parties may agree." As a practical matter, this provision effectively gives [the] plaintiff the exclusive power to deny defendant reasonable visitation with the child by withholding his consent. An order giving the custodial parent exclusive control over visitation will not

> be sustained. . . . This Court in *Stancil* explained that the award of visitation rights is a judicial function which may not be delegated to the custodial parent[:] "Usually those who are involved in a controversy over the custody of a child have been unable to come to a satisfactory mutual agreement concerning custody and visitation." [*Stancil*, 10 N.C. App.] at 552[.]

*Id.* at 733.

Here, unlike in *Stancil* and *Brewington*, the delegation of authority to Sara's uncle is partial, not total; the juvenile court required Mother be given "visitation for a minimum of two hours every week[,]" with "discretion . . . given to the custodian as to time and location" in the event the parties could not agree. Nonetheless, we have, from time to time, reversed visitation orders by a trial court for partial delegations of discretion where the circumstances may permit an adverse party to prejudice the visitation rights of the appellant. *See In re J.D.R.*, 239 N.C. App. 63, 76 (2015) ("The trial court effectively turned [f]ather into [m]other's case worker . . . . The present case is distinguishable from cases such as . . . *Stancil*[] . . . in which this Court vacated visitation orders that gave the respective juveniles' custodians *complete* discretion over the juveniles' parents' visitation rights[.] . . . However, in the present case, the trial court's delegation to [f]ather still goes too far."); *In re A.P.*, 281 N.C. App. 347, 361 (2022) ("[T]he trial court's visitation order improperly delegated a judicial function to [r]espondent-[f]ather by allowing him the sole discretion to decide where and by whom [r]espondent-[m]other would be supervised during her visitations with the minor child."). And, critically, the juvenile court in this case clearly indicated that

Mother was to receive some amount of visitation—a necessary prerequisite for a parent to trigger *Stancil*'s nondelegation principle. *Stancil*, 10 N.C. App. at 551.

As Mother points out, the delegation of authority to Sara's uncle carries the possibility of trivializing her visitation rights by "setting visitation to a limited location, such as the custodian's living room only, or setting visitation in the middle of the night when [Sara] is asleep." While it is perhaps unlikely that Mother would be received in such wanton bad faith in her attempts to see her daughter, it is for the trial court, not the child's custodian, to safeguard Mother's ability to exercise appropriate visitation with Sara, *Stancil*, 10 N.C. App. at 552, and it formally remains a possibility that such misconduct could occur under the terms of the current order's visitation scheme. Accordingly, we must vacate that portion of the permanency planning hearing order and remand for the entry of a new order with an appropriate visitation scheme.

### G. N.C.G.S. § 50-13.2

Finally, Mother argues the custody order was deficient under N.C.G.S. § 50-13.2. This argument is moot, as it pertains exclusively to the custody order, which we have already held must be vacated for lack of jurisdiction. *See Roberts v. Madison Cty. Realtors Ass'n, Inc.*, 344 N.C. 394, 398-99 (1996) ("A case is 'moot' when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." (citation omitted)).

### IV. Conclusion

The district court's custody order was void, as the juvenile court never properly terminated its jurisdiction pursuant to N.C.G.S. § 7B-911. Furthermore, the permanency planning hearing order, while legally correct and supported by clear and convincing evidence on the Record in most respects aside from the termination of jurisdiction and Mother's visitation, contains an improper delegation of Mother's visitation rights to Sara's uncle and must therefore be vacated. On remand, jurisdiction will remain with the juvenile court until such time as the juvenile court's jurisdiction is properly terminated pursuant to N.C.G.S. § 7B-911.

VACATED AND REMANDED.

Judge CARPENTER concurs.

Judge TYSON concurs in part and dissents in part by separate opinion.

TYSON, Judge, concurring in part and dissenting in part.

The majority's opinion correctly vacates both the district court's permanency planning order and the custody order. Sarah had been placed in the custody of her uncle for less than six months. The trial court unlawfully terminated its jurisdiction pursuant to N.C. Gen. Stat. § 7B-911 (2025).

The trial court also unlawfully delegated authority for visitation in the permanency planning order. The majority's opinion correctly vacates this part of the permanency planning order and correctly vacates the custody order for lack of jurisdiction. I concur with the majority's opinion on these issues.

The entire permanency planning order should be vacated on the above bases. The majority opinion improperly affirms the trial court's conclusion Mother was unfit or had engaged in conduct which relinquished her constitutionally-protected parental rights. Both orders are properly vacated in their entirety. I respectfully dissent.

### V.    Waiver of Constitutional Rights

Mother is presumed to be a fit parent, to act consistently with her parental rights, and to act in the best interests of her children. *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 69 L. Ed. 1070, 1078 (1925) ("The child is not the mere creature of the State; those who nurture [her] and direct [her] destiny have the right, coupled with the high duty, to recognize and prepare [her] for additional obligations."); *Stanley v. Illinois*, 405 U.S. 645, 651, 31 L. Ed. 2d 551, 558 (1972) (Court affirmed the

*TYSON, J., concurring in part and dissenting in part.*

fundamental exclusive rights of parents "in the companionship, care, custody, and management" of their children.); *Wisconsin v. Yoder*, 406 U.S. 205, 232, 32 L. Ed. 2d 15, 35 (1972) ("This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Washington v. Glucksberg,* 521 U.S. 702, 720, 138 L. Ed. 2d 772, 787 (1997) (the Constitution, and specifically the Due Process Clause of the Fourteenth Amendment, protects the fundamental right of parents to direct the care, upbringing, and education of their children.); *Troxel v. Granville*, 530 U.S. 57, 68-69, 147 L. Ed. 2d 49, 58 (2000) (Court again unequivocally affirmed the fundamental and exclusive rights of parents to direct the care, custody, and control of their children.); *Mirabelli v. Bonta*, __ U.S. __, __, __ L. Ed. 2d __, __, 2026 U.S. LEXIS 1192, *7 (2026) ("Under long-established precedent, parents —not the State—have primary authority with respect to 'the upbringing and education of children.'" (citation omitted)).

Our Supreme Court recently examined the adjudication of a sibling of an infant with unexplained fractures in the case of *In re E.H.*:

> In these cases, we reaffirmed longstanding precedent holding that a "court may not adjudicate a juvenile neglected *solely* based upon previous Department of Social Services involvement relating to other children," and that there must be "the presence of other factors to suggest the neglect or abuse will be repeated." *In re J.A.M.*, 372 N.C. at 9-10 (emphasis added). But we also recognized that those "other factors" can be circumstances surrounding the abuse itself that indicate other children in the home could face similar harm. *In re A.J.L.H.*, 384 N.C. at 55.

Thus, when another child in the same home has suffered some abuse or injury, *the trial court should assess how and why that harm occurred, whether other children in the home could be subject to that same harm, and whether the parents display a willingness to "remedy the injurious environment" that caused the harm* so that it cannot occur again. *Id.* at 56; *In re A.W.*, 377 N.C. at 249. Facts that can demonstrate a parent's unwillingness to remedy the injurious environment include offering an "implausible explanation" for the abuse of another child, "failing to acknowledge" another child's abuse, or "insisting that the parent did nothing wrong when the facts show the parent is responsible for the abuse." *In re A.J.L.H.*, 384 N.C. at 56; *see also In re A.W.*, 377 N.C. at 248-49.

*In re E.H.*, 388 N.C. 100, 105-06, 919 S.E.2d 233, 237 (2025).

The Supreme Court further held:

When a child is severely abused in the parents' care, and the parents cannot provide any plausible explanation for how those injuries occurred or assure social workers that the abuse will not happen again, the trial court properly can find that there is an unacceptable risk of similar abuse to other children in that same home in the future. *In re D.W.P.*, 373 N.C. at 339-40; *In re A.W.*, 377 N.C. at 248-49; *In re A.J.L.H.*, 384 N.C. at 55-56.

*Id.* at 107, 919 S.E.2d at 238.

DSS carries the burden to overcome the presumption of fitness and parental rights to the exclusive care, custody, and control of her children and must prove by clear, cogent, and convincing evidence Mother acted inconsistently with her constitutionally-protected status as a parent. *Weideman v. Shelton*, 247 N.C. App. 875, 880, 787 S.E.2d 412, 417 (2016) ("A trial court must determine by clear and convincing evidence that a parent's conduct is inconsistent with his or her protected

status.").

Findings of fact must be supported by clear and convincing evidence to support findings and conclusions of unfitness or conduct inconsistent with parental rights to deny a parent's primary and exclusive care, custody, and control of her child. *See* N.C. Gen. Stat. § 8C-1, Rule 401 (2025); *In re J.C.-B.*, 276 N.C. App. 180, 187, 856 S.E.2d 883, 889 (2021). The majority's opinion correctly disregards Finding of Facts 21, 31, and 52 as unsupported by the evidence to support any conclusions.

The majority's opinion does not analyze Mother's argument asserting no evidence tends to show any culpability by her or allegations her deceased son died while she was at home or in her care. North Carolina Rule of Civil Procedure 52(a) mandates: "In all actions tried upon the facts without a jury. . . the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment." N.C. Gen. Stat. § 1A-1, Rule 52(a) (2025).

The majority's opinion prejudicially errs by concluding Finding of Fact 26 is otherwise supported. No allegation or charges have been asserted against Mother concerning her son's death. DSS' allegations of Mother's purported neglect of Sarah are based "solely" on her son's death. *In re E.H.*, 388 N.C. at 105-06, 919 S.E.2d at 237.

No evidence tends to show and the district court made no supported findings concerning Mother's actions, involvement, or culpability whatsoever in the death of her son to support a finding and conclusion she also neglected her daughter, Sarah.

The unsupported findings do not support the district court's conclusions of law. Mother's purported and unsupported waiver of her constitutional parental rights in the permanency planning order is also properly vacated. *Id.*

## VI.    Conclusion

Our Supreme Court held, "this Court has enunciated the fundamental principle that absent a finding parents, (i) are unfit or (ii) have neglected the welfare of their children, the constitutionally-protected-paramount right of parents to custody, care, and control of their children must prevail." *Adams v. Tessener*, 354 N.C. 57, 60, 550 S.E.2d 499, 501 (2001) (citation and quotation marks omitted).

The majority's opinion correctly vacates both the district court's permanency planning order and the custody order. Sarah had been unlawfully placed in the custody of her uncle for less than six months. The majority's opinion correctly vacates this part of the permanency planning order. The majority's opinion also correctly vacates the custody order for lack of jurisdiction. I concur in those portions of the majority's opinion.

The entire permanency planning order should be vacated on the above bases. The majority's opinion improperly affirms the trial court's wholly unsupported finding and conclusion Mother was unfit or had engaged in conduct to relinquish her constitutional parental rights. Both orders are properly vacated in their entirety and remanded. I respectfully dissent.